*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2011-313

JANUARY TERM, 2012

| | |
|---|---|
| In re I.C., M.C., A.C. and A.H., Juveniles | APPEALED FROM: |
| | Superior Court, Caledonia Unit, Family Division |
| | DOCKET NOS. 30/31/32-5-10 & 44-8-10 Cajv |
| | Trial Judge: M. Kathleen Manley |

In the above-entitled cause, the Clerk will enter:

Mother appeals the family division's order terminating her parental rights with respect to her children, I.C., M.C., A.C., and A.H. Father separately appeals the same order with respect to his and mother's child, A.H. We affirm.

This case concerns four children: I.C., born in July 2001; M.C., born in March 2005; A.C., born in February 2006; and A.H., born in October 2008. With respect to the three oldest children, mother has indicated that two of the children's fathers have been deported and one is deceased. These three putative fathers were never married to mother, were never subject to a judgment of parentage, have not been involved to any significant degree in the children's lives, and could not be located despite very substantial efforts by the Department for Children and Families (DCF). They did not participate in the termination hearings.[*]

Mother had a troubled childhood in which she experienced trauma and witnessed domestic violence. She has grappled with drug dependency and mental-health issues since she was a teenager. Father met mother in 2006 and lived with her periodically over the next four or five years. Father and mother married in October 2010, but father left mother in March 2011.

Mother was living in Massachusetts when she gave birth to I.C. in 2001. Between 2002 and 2006, the Massachusetts Department of Social Services became involved with the family on at least three occasions as the result of reports of mother's ongoing drug use, her neglect of I.C., domestic violence within the family, and an unstable and unsanitary home environment. Between 2006 and 2010, mother and the children moved intermittently between Massachusetts, Vermont, and New York, staying at times at shelters or with friends or family. During that time, mother was involved with various partners and continued to struggle with drug dependency and mental-health issues. The children were exposed to drug use, domestic violence, and homelessness. DCF became involved with the family on a number of occasions beginning in 2007.

---

[*] Accordingly, references to "father" in this opinion relate solely to the father of the youngest child, A.H.

On May 3, 2010, mother's mother called DCF to report that mother had dropped the three oldest children off with her three weeks prior and had left for Massachusetts. The grandmother wanted to obtain guardianship over the children, but she could not do so because of her own health needs. She was also limited in helping the children because mother was receiving I.C.'s SSI checks and the children were still registered for benefits in Massachusetts, thereby preventing the grandmother from obtaining Medicaid benefits for the children in Vermont to address their significant medical needs. On May 23, A.C. was seriously injured in a dog attack in connection with which she required surgery; because mother was not in Vermont and was constantly moving, grandmother had no authority to authorize surgery and did not have the information she needed regarding Medicaid coverage.

On May 25, 2010, the family division of the superior court issued an emergency care order regarding the three older children based on mother's abandonment and the absence of anyone authorized to deal with the children's medical needs. A temporary care hearing was held two days later, but mother's whereabouts were unknown. After mother was located, another temporary care hearing was set for June 17, 2010, at which time mother was present with counsel. Following a contested hearing the court continued temporary custody with DCF, concluding that returning the three children to mother would result in substantial danger to their physical and mental health. After mother failed to appear at two July hearings, a final merits hearing was scheduled for September 9, 2010.

In the meantime, on August 2, 2010, the court issued an emergency care order with respect to A.H. based on trauma symptoms exhibited by the older three children, mother's constant moves, and concerns about the lack of routine medical care for the child. The court continued the temporary care hearing until mother and A.H. were located. Following an August 19, 2010 hearing, the court issued a temporary care order continuing DCF custody.

On September 9, 2010, the parties entered into a written stipulation agreeing to a factual basis for the court to find by clear and convincing evidence that the three older children were in need of care and supervision because they were without parental care necessary for their well-being. On October 21, 2010, the parties entered a similar stipulation with respect to A.H.

DCF filed the disposition plans for the three older children and A.H. on October 8 and November 24, 2010, respectively. The plans identified services available for mother and father, but recommended termination of parental rights at the initial disposition hearing. The termination hearing was held over three days in mid-April 2011. On July 26, 2011, the family division filed a twenty-eight-page decision terminating mother's and father's parental rights and freeing the children for adoption.

Mother and father have filed separate appeals of the court's termination order. Mother argues that the record does not support either: (1) the court's findings that she was in only the preliminary stages of achieving enough stability in her life to resume parental duties and that it would take her one to two years to reach that goal; nor (2) the court's conclusion that mother would not be able to resume her parental duties within a reasonable period of time. Father argues that the court erred by making its initial disposition determination without waiting for home study reports concerning potential placements with his family. The State opposes mother's and father's efforts to overturn the trial court's termination decision, and the children join in the State's brief asking this Court to uphold the decision.

We first consider mother's arguments. Mother essentially challenges the evidentiary basis for the court's conclusion regarding the third and most important factor of the four best-interest factors contained in 33 V.S.A. § 5114(a)— the likelihood that the parent will be able to resume parental duties within a reasonable period of time. Indeed, mother's first argument concerning the evidentiary basis for some of the court's findings is actually part of her second argument that the record does not support the court's determination that she will be unable to resume her parental duties within a reasonable period of time.

After making 126 findings detailing the mother's history of neglect and the children's exposure to domestic violence, drug use, homelessness, and constant moving over the course of nearly a decade, the court reached the following conclusions in regard to the critical third best-interest factor:

> There is little, if any likelihood that Mom will be able to assume or resume parental duties within a reasonable time. To her credit Mom has seemingly begun to engage in services in a meaningful manner and at long last appears to be getting much needed treatment and assistance. She has had a difficult life and her concerted effort to engage in treatment is commendable. As noted by her psychiatrist, change, to the level needed to parent these children in the way they require, does not happen quickly. She was clearly overwhelmed by their many needs and still is not able to have unsupervised contacts or even decrease the number of persons necessary to supervise. Every treatment provider for the children had the same message; the children need stability, predictability, safety and someone who is able to meet their needs day in and day out on a consistent basis.

> Mom is in the very early stages of learning how to provide safely for herself. She is not capable of doing so for the children at present, nor in the near future. While she has begun to make some progress on those areas identified in the action plan, they were preliminary steps to show consistency and some stability. She has not been able to establish and maintain a consistent safe home for a period of six months, much less to be able to provide such a home in a manner that is safe and stable for the children. It is not the undersigned's intent to denigrate the progress Mom has made and it is hoped that she will continue to follow through with all of the services in which she is engaged, for her own sake. However, Mom is not in a position to parent even one of these children at this time.

> To ask the children to wait in limbo in foster care for the one or two years or more that it will take Mom to maybe be in a position to provide a safe, nurturing and stable home for the children is not in their best interest; it is only anxiety producing. Moreover the children need more than that. They need to be nurtured, intellectually stimulated and parented safely, all areas beyond Mom's ability to provide and things she will have to learn how to do. The children need to have stability and permanence now. Their current homes provide that to them.

> Mom has maintained consistent contact with the children and it is clear that she loves them. It is equally as clear that the three older children miss their Mom, based on statements made to therapists immediately after

3

having contact with Mom. What is difficult to find however is that Mom plays a constructive role in their lives. Certainly when the children lived with them Mom probably tried to do her best but the chronic homelessness, exposure to drugs, danger and Mom's absences has caused much emotional distress to the children and problems that they will continue to work on for some time.

Waiting to see if Mom can pull it together enough to parent the children in the manner they require and deserve is not in their best interest.

As evidenced by these conclusions and several of the court's findings, mother's assertion that the court inaccurately emphasized the negative and failed to give her credit for the progress she has made is not supported by the record. The trial court acknowledged mother's efforts and her love for her children, but concluded that her neglect and absence, the ongoing drug use and domestic violence, and the perpetual homelessness as she moved from place to place for nearly a decade had a significant negative impact on the children's lives. Most significantly, the court concluded that mother was not reasonably likely to be able to resume parental duties within a reasonable time relative to the needs and best interests of the children.

Mother asserts that the evidence does not support the court's conclusion that she was in the preliminary stages of providing stability for her children. The court made the following findings, among others— all supported by record evidence and unchallenged by mother— in support of its conclusion regarding mother's progress: (1) She had been offered services at various time since 2002, but did not seriously engage in any services until the fall of 2010 after A.H. was taken into DCF custody; (2) when she finally did engage seriously in mental-health counseling, she initially refused to sign a release and eventually signed only a limited release that allowed DCF to verify participation but not the nature of the counseling or the results of drug testing; (3) she was not required to give observed urine samples, and thus any abstinence is solely by self-report and not independent verification; (4) her involvement with her mental health counselor was inconsistent at times through February 2011; (5) since engaging in services, she has been diagnosed as being bipolar, cannabis dependent, abusive of alcohol, and also suffering from borderline personality disorder and ADHD (attention deficit hyperactivity disorder); (6) by all accounts, she is emotionally fragile and in the very early stages of recovering from substance addiction; (7) although counseling has helped her with anger management and maintaining a sober lifestyle, the counseling has not addressed how her childhood experiences, past drug use, mental problems, and domestic violence in her life has had a negative impact on her children or her ability to parent; (8) her psychiatrist agreed that treatment of a personality disorder is a very long process; and (9) her primary counselor is unaware of her medication regimen or her involvement with her children or their circumstances.

These findings and many others, all supported by evidence in the record, support the court's conclusion that mother is in the preliminary stages of stabilizing her life and putting herself in a position to parent her children. The court's findings do not directly address mother's most recent housing situation, but the court found that she was moving around in the fall of 2010 and was living in her car for a period of time in December 2010. Obviously, given mother's longstanding issues of drug dependence, mental problems, and homelessness over a period of many years, the court did not err in characterizing her recent efforts to address those issues as preliminary in nature.

4

We find unavailing mother's complaint that the court "conflated" the children's long-term needs for stability with mother's inability to assume parental duties in the immediate future. Although the question of a parent's ability to resume parental duties is forward-looking, the state of the parent's progress must be considered in relation to the children's needs for stability and permanence. See In re B.M., 165 Vt. 331, 337 (1996). On this point, the trial court's findings, unchallenged and supported by record evidence, indicate that: (1) the children, to varying degrees depending on their ages and other factors, suffered considerable emotional trauma and developmental delays while in their mother's care; (2) when the children came into foster care, they suffered, to varying degrees, from anxiety, nightmares, fear of the dark, and sleep problems; (3) they hoarded food and exhibited inappropriate sexualized behaviors; and (4) since being in foster care, they have made significant progress in development and emotional stability.

The court found credible testimony from the children's therapists that the children needed permanence and stability in their lives after what they had been through before they came into foster care. Specifically, the court found credible the testimony of I.C.'s therapist that the child needed "a 'roadmap' as to where he is going to be and a stable environment with appropriate social connections," noting that he would "decompensate quickly" if he were returned to a "chaotic household."

Similarly, M.C.'s therapist testified that the child needed a consistently nurturing and safe environment to thrive and that she would regress absent such an environment. The court found credible her therapist's opinion that any long-term foster care or other temporary arrangement would negatively affect M.C.'s ability to attach to others. The court also found that A.C. needed predictability, safety, and consistency in her life, and that continued foster care would cause uncertainty, while returning to her former unpredictable lifestyle would negatively impact her development. The trial court found that the foster parents for the three older children were highly skilled, and needed to be, given the children's significant needs.

As for A.H., the court found that her significant developmental delays at the time she came into foster care were directly related to her experiences and trauma sustained in an unstable environment under mother's care. The court noted the remarkable strides she had made since joining her foster family and found that if A.H. were to return to an unstable environment, it would impede further developmental progress. The court noted that two-and-one-half-year-old A.H. had been with her foster family at that point for eight months, a significant portion of her young life, and had bonded with the family.

Mother does not challenge any of these findings, but contends that there is no support for the family court's isolated comment in its conclusions that mother would need one or two years or more to put herself in a position to provide a safe and nurturing home for the children. The record amply reveals the depths and history of mother's longstanding problems and the uncertainty of her ability to turn her life around in the long run. At the same time, the evidence supports the trial court's conclusion that the children need stability and permanence in the very short run. As a whole, the record supports the court's conclusion that mother will be unable to resume her parental duties within a reasonable period of time from the perspective of the children.

For his part, father does not challenge the trial court's termination of his parental rights based on its assessment of his circumstances and relationship with A.H. Rather, he argues only that the court erred by entering its termination order before obtaining home-study reports of two of his relatives, including his mother. As the court acknowledged in its findings, when A.H. came into custody, at which time father was in New York living with his mother, DCF asked the

New York social services agency to do home studies of father and potential paternal relatives. Father argues that because home study reports of his mother and another potential relative were not completed and presented to the court for consideration, the court did not have adequate evidence to make a disposition determination at the initial disposition hearing.

Father acknowledges this Court's decision in In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496 (mem.), where we held that once a court determines that termination is the proper disposition under the statutory best-interests criteria, it need not explain why it is choosing termination over other statutory permanency options. Father argues, however, that T.T., which was decided before the comprehensive rewrite of the juvenile statutes in 2008, is distinguishable because it did not concern a termination at the initial disposition hearing.

We find father's argument unavailing. The legislature has expressly directed courts to consider kinship placements in the context of temporary care orders before a CHINS (child in need of care or supervision) adjudication. See 33 V.S.A. § 5308(b) (setting forth potential temporary placements for the court to consider in order of preference, with relatives being the third and fourth options after conditional placement with the custodial parent or placement with the noncustodial parent). At the disposition stage, by contrast, the legislature has established no order of preference or requirement that the court consider certain placement options.

To the contrary, the statutory provision addressing the disposition hearing provides that if the commissioner of DCF or the attorney for the child seeks an order terminating parental rights at the disposition hearing, "the court shall consider the best interests of the child in accordance with section 5114." 33 V.S.A. § 5317(d). Section 5114 sets forth specific criteria for the court to consider in determining whether to terminate parental rights. Although that section does include as a factor in the best interests analysis "the interaction and interrelationship of the child with . . . any [] person who may significantly affect the child's best interests," there is no requirement that certain categories of people, such as relatives, be considered for placement before the court may terminate parental rights.

In this case, there was no evidence that father's mother or any other of his relatives had a significant relationship with A.H. Indeed, the only evidence concerning father's mother was that she was arrested as the result of her confrontational behavior when social services personnel went to New York to pick up A.H. We reject father's argument that the absence of the home studies of his relatives deprived the court of essential information before his parental rights could be terminated.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice


_____
Brian L. Burgess, Associate Justice


_____
Beth Robinson, Associate Justice

6